## Commonwealth v. Shippensburg Borough

*Terry Bossert, Assistant Attorney General,* for Commonwealth.
*William F. Martson,* for defendant.

SHUGHART; *P.J.,* MacPHAIL, *P.J.,* Judicial District, Specially Presiding, April 7, 1977 — In this case defendant has appealed from summary conviction on three charges: (1) violation of section 401 of The Clen Streams Law of June 22, 1937, P.L. 1987, as amended, 35 P.S. §691.401; (2) violation of section 602 of The Clean Streams Law, supra, 35 P.S. §691.602; and (3) violation of section 200 of The Fish Law of December 15, 1959, P.L. 1779, as amended, 30 P.S. §200. Following the presentation of the Commonwealth's evidence, defendant demurred to that evidence on all counts. In view of the importance of the case and to avoid the necessity of a long delay in the hearing, we took the demurrer under advisement and heard defendant's testimony subject to our subsequent ruling on the demurrer.

## FACTS

On June 8, 1976, defendant was making repairs to the Orange Street Bridge. These repairs involved the pouring of concrete into a hole on the bank of Middle Spring Creek. Water seeped into the hole and had to be pumped out onto the bank before the concrete could be poured. While the concrete was being poured, however, there was water in the hole and during the pumping operation the color of the water in the creek changed to a light gray, the same color as the discharge from the pump hoses on the creek bank. The engineer for the project recommended that sandbags and plastic be placed in the vicinity of the hole to protect against any leakage. It was not clear from the testimony whether those bags and plastic were placed before or after the leakage occurred. A "rich

mix" of concrete was used. During the course of pouring the concrete, a part of the bank fell in. A municipal employe participating in the construction said he was splashed by concrete as it was being poured. The concrete was poured some time after 3 o'clock on June 8th.

At about 7:15 a.m. on June 9th, a patrolman of the Shippensburg Police Department observed dead fish in the creek downstream from the Orange Street Bridge. He notified another officer who, in turn, notified a District Waterways patrolman. At the same time, a municipal employe was instructed to remove dead fish from the stream by his supervisor.

On the same dates, June 8th and 9th, a private swimming pool near the creek at Neff Alley was being sprayed with gunnite. Deliveries of concrete were made to the site June 3rd, 4th, 7th, 8th, 9th and 10th. Neff Alley is downstream from the Orange Street Bridge. The discoloration of water in the stream was observed upstream from Neff Alley. Dead fish were also observed immediately downstream from the bridge, between the bridge and Neff Alley, as well as below Neff Alley.

Cement is deleterious to aquatic life. Elements contained in cement adversely affect the PH factor in water causing the death of fish. The dead fish gathered from Middle Spring Creek on June 9th died as a result of the pollutant in the creek. There was no evidence of toxicity in the water before or after June 9th. The Department of Environmental Resources was never advised of the contamination by the Borough of Shippensburg.

While all of the evidence in the case is circumstantial, we are well satisfied that the Commonwealth has proved beyond a reasonable doubt

that the cement which entered Middle Spring Creek during the repairs to the Orange Street Bridge polluted the creek and caused the death of the fish. It is possible that the contractor responsible for the repairs to the private swimming pool may also have been responsible for some part of the pollution, but, even if that were true, it would not exonerate the municipality of the charges pending against it.

## VIOLATION OF THE FISH LAW

Defendant does not rest its case on the factual determination alone but raises substantial questions of law as well.

It will be observed that the pertinent part of section 200 of The Fish Law, supra, reads as follows:

". . . No person shall allow any substance of any kind or character, deleterious, destructive or poisonous to fish, aquatic organisms, amphibians and reptiles, to be turned into or allowed to run, flow, wash or be emptied into any waters within this Commonwealth. . . ."

Section 3 of The Fish Law defines "person" as follows:

"(1) 'Person' shall include individuals, copartnerships, associations and corporations . . ."

Defendant argues that since that definition does not specifically mention "municipalities," they are excluded. The Commonwealth urges that such a construction of the law would be absurd because it would permit municipalities to do what other persons are prohibited from doing.

However, on April 6, 1960, the Attorney General of Pennsylvania rendered an official opinion to the Pennsylvania Fish Commission (Anti-Pollution Laws, 21 D. & C. 2d 273), in which she stated that

the anti-pollution provisions of The Fish Law do not apply to municipalities. The Attorney General noted that the provisions of The Clean Streams Law, supra, do specifically mention municipalities. While such opinions are not binding upon us, they are entitled to great weight: Federal Deposit Insurance Corp. v. Board of Finance & Revenue, 368 Pa. 463, 84 A.2d 495 (1951). It is significant to us that *after* the Attorney General's opinion was rendered, the legislature amended section 1 of The Fish Law, Act of July 31, 1968, P.L. 1019, but did *not* change the definition of "person." This failure of the legislature to amend the definition with full knowledge of the Attorney General's opinion, may be considered by us in a determination of what the legislative intent was: McDowell v. Good Chevrolet-Cadillac, 397 Pa. 237, 154 A.2d 497 (1959). It is also significant that section 200 of The Fish Law provides specifically that the provisions thereof would not in any way repeal or supersede the provisions of The Clean Streams Law which, as we have noted, does prohibit municipalities from polluting streams. Finally, although The Clean Streams Law defines "person" in practically the same terms as The Fish Act, the prohibition against pollution language in section 401, infra, not only mentions "person" but *also* "municipality." Accordingly, we are of the opinion that had the legislature intended to include municipalities as potential offenders under The Fish Law, they could, and should, have done so. Their failure to do so can only be interpreted as intentional on their part, a prerogative which was certainly theirs.

In view of the foregoing, we conclude that defendant, although it committed acts which would constitute a violation of The Fish Law, cannot be

prosecuted under the present provisions of that law and that defendant's demurrer as to the charge of violating The Fish Law should be, and is now, sustained.

## VIOLATIONS OF CLEAN STREAMS LAW

Section 401 of The Clean Streams Law reads as follows:

"It shall be unlawful for any person or municipality to put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person or municipality into any of the waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein defined. Any such discharge is hereby declared to be a nuisance."

Section 1 of the act, 35 P.S. §691.1, defines "pollution" as follows:

" 'Pollution' shall be construed to mean contamination of any waters of the Commonwealth such as will create or is likely to create a nuisance or to render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, municipal, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, including but not limited to such contamination by alteration of the physical, chemical or biological properties of such waters, or change in temperature, taste, color or odor thereof, or the discharge of any liquid, gaseous, radioactive, solid or other substances into such waters. The board shall determine when a discharge constitutes pollution, as herein defined, and shall establish standards whereby and wherefrom it can be ascertained and determined whether any such

discharge does or does not constitute pollution as herein defined."

Initially, defendant contends that unless the Sanitary Water Board determines that a discharge constitutes pollution, no prosecution will lie. This same issue was raised in Commonwealth v. Penn Central Transportation Co., 98 Dauph. 120 (1976), where the court held that the primary definition of pollution is the contamination of any waters which is likely to render such waters harmful, detrimental or injurious to public health. Noting that the emission in the case before them was toxic, changed the colors of a large section of the river, produced an odor and resulted in floating material, the Dauphin County court held that those properties violated the general water quality criteria under the Department of Environmental Resources Regulations. In the case now before us, we have found as a fact that the pollution of the water by defendant caused the death of fish. No "standard of pollution" is required under such circumstances.

Next, defendant argues that the Commonwealth failed to prove any criminal intent on the part of the borough. This argument was also raised in Commonwealth v. Penn Central Transportation Co., supra, and the court concluded that violations of section 401 of The Clean Streams Law are malum prohibitum and intent is not an essential element of the crime. We agree.

Also, defendant urges that conviction under section 401 of The Clean Streams Law and section 200 of The Fish Law would constitute double jeopardy. This argument is rendered moot by our ruling on the demurrer as to The Fish Law violation.

Having found as a fact that defendant did cause the pollution and having ruled against defendant on its legal arguments, we will overrule the demurrer and find defendant guilty of violating section 401 of The Clean Streams Law.

Finally, we consider the alleged violation of section 602 of The Clean Streams Law, supra. Specifically, defendant is charged with violating section 101.2(a) of the D.E.R. Regulations, 25 Pa. Code, 101.2(a), which requires persons or municipalities to notify the Department of Environmental Resources and all downstream users, where it is possible to do so, forthwith of any accident, incident or activity where a substance is discharged into a stream which would pollute the stream or where it "might" discharge, flow or be washed into the stream. The Commonwealth's evidence was that no such report was filed by the borough. The only report the department received was from the District Waterways patrolman. Defendant contends that the Commonwealth was notified when a borough police officer called the District Waterways patrolman employed by the Fish Commission. It will be noted, however, that the notice required by the D.E.R. Regulation specifically mentions notice to the Department of Environmental Resources. We hold that notification to the District Waterways patrolman was not compliant with the regulation.

Defendant also contends that there was no way that prompt notice after they became aware of the situation could have prevented the damage which resulted from the pollution. The obvious intent of the regulation is to alert others downstream from the accident about the possibility of pollution and the mere fact that the damage appeared to be done

by the time the borough discovered the problem is no reason for failing to give notice to the Department of Environmental Resources.

Finally, defendant contends that the required notice constitutes a violation of defendant's constitutional privilege against self-incrimination. That defense is not available to this defendant. In the first instance, the required notice itself admits only that an accidant has occurred which *may* cause pollution. Secondly, there is some authority which would indicate that municipalities cannot claim constitutional rights as against the sovereign state: D.E.R. v. Borough of Carlisle, 16 Pa. Commonwealth Ct. 341, 330 A.2d 293 (1974). Finally, it has been held that the privilege against self-incrimination is not available to corporations: Curcio v. United States, 354 U.S. 118, 1 L.Ed.2d 1225 (1957), and George Campbell Painting Corp. v. Reid, 392 U.S. 286, 20 L.Ed.2d 1094 (1968).

We conclude that defendant failed to file the required notice and that there are no legal reasons why the sanctions provided in section 602(a) of The Clean Streams Law should not be imposed.

## CONCLUSIONS OF LAW

1. Section 200 of The Fish Law does not apply to municipal corporations.

2. Defendant is guilty of violating section 402 of The Clean Streams Law.

3. Defendant is guilty of violating section 602 of The Clean Streams Law.

## PENALTY

The matter of an appropriate fine is troublesome. The statute provides a maximum fine of $1,000 for the first offense. The district justice of

the peace levied substantial fines for all three offenses. Nevertheless, we are mindful that any fine assessed must be paid from tax dollars paid by citizens who were not responsible for the violations. We have also considered that a second or subsequent offense within two years will carry a maximum fine of $5,000. Under all of the circumstances, it seems that the interests of justice will be served if a minimum fine is assessed for these offenses but with the stern admonition that future offenses will be dealt with severely.

## ORDER OF COURT

And now, April 7, 1977, it is ordered that the appeal be, and the same is hereby, sustained as to the alleged violation of section 200 of The Fish Law. The appeal is denied as to the violations of section 402 and section 601 of The Clean Streams Law. Defendant is ordered to pay a fine in the sum of $200 for each offense and to pay the costs of prosecution.