Philadelphia Facilities Management Corporation et al., Plaintiffs v. The Honorable Edward G. Biester et al., Defendants.

Tenant Action Group, Intervenor.

Argued December 9, 1980, before President Judge CRUMLISH and Judges WILKINSON, JR., MENCER, ROGERS, WILLIAMS, JR., CRAIG and PALLADINO. Judges BLATT and MacPHAIL did not participate.

*Daniel J. Zucker,* with him *James Lewis Griffith,* and *John J. Leonard, Obermayer, Rebmann, Maxwell & Hipple,* for plaintiffs.

*Robert B. Hoffman,* Deputy Attorney General, with him *Norman D. Watkins,* Deputy Attorney General, *Allen C. Warshaw,* Chief, Civil Litigation, and *Harvey Bartle, III,* Attorney General, for defendants.

*Stephen P. Ulan,* with him *George D. Gould,* and *Stephen Bosch,* for intervenor, Tenant Action Group.

OPINION BY JUDGE WILLIAMS, JR., July 8, 1981:

Before us in this matter is an original action challenging the constitutionality of the Utility Service Tenants Rights Act.[1] The suit was brought by Philadelphia Facilities Management Corporation (Management Corporation) suing on behalf of itself, on behalf of the Philadelphia Gas Works (PGW), and on behalf of all the ratepaying customers of PGW. Also named as a party-plaintiff is PGW itself, suing in its own right and on behalf of all its ratepaying customers. The plaintiffs urge this Court to declare the Act to be violative of the federal and state constitutions, and to enjoin the Act's enforcement.[2]

The defendants are the state Attorney General, the state Secretary of Revenue, and an organization called "Tenant Action Group," which was permitted to intervene as a party-defendant. The defendants have filed preliminary objections which (1) demur to the standing of the named plaintiffs to bring the action; (2) question, by demurrer, the legal sufficiency of the complaint; and (3) move for a more specific complaint. The preliminary objections, and only the preliminary objections, are the point of our decision in the instant matter.

The Utility Service Tenants Rights Act (Act), enacted in 1978, seeks by a series of provisions to protect the utility service to residential tenants from discontinuance caused by the failure of the landlord ratepayer to pay the bill. One of the striking features of the Act is that it applies only to a public utility owned or operated by a "municipal corporation" as that term is defined by the Act.

The Act provides that before a subject utility may discontinue service to a residential landlord ratepayer,

---

[1] Act of November 26, 1978, P.L. 1255, 68 P.S. §§399.1 et seq.

[2] The plaintiffs concede that this action is *not* a class action.

the utility must give such a landlord at least 37 days advance written notice of the proposed discontinuance. More significantly, the utility must also give written notice of the proposed discontinuance to "each residential unit reasonably likely to be occupied by an affected tenant."[3] And, the utility must notify a prescribed agency of local government. The notice to the tenants must be given at least 7 days after notice to the landlord and at least 30 days before any actual discontinuance. Notice to. the local agency must be given at the time the tenants are notified.

The Act imposes on the landlord a duty of supplying the utility with the names and addresses of every affected tenant. So too, the Act imposes on the utility the duty of pursuing any appropriate legal remedy to obtain that information from a landlord.

What may be considered the key substantive provisions of the Act for tenants are Sections 7 and 9.[4] Section 7 grants to affected tenants the legal right to prevent discontinuance of service by paying the landlord's utility bill, and states in part as follows:

> (a) At any time before or after service within the utility's corporate limits is discontinued by a public utility on account of nonpayment by the landlord ratepayer, the affected tenants may apply to the utility to have service continued or resumed. A public utility shall not discontinue such service or shall promptly resume service previously discontinued if it receives from the tenants an amount equal to the bill of the landlord ratepayer for the 30-day period preceding the notice to the tenants.

By force of Section 9 of the Act, any tenant who has made such payment is entitled to deduct it from any

---

[3] Section 3(a)(3) of the Act, 68 P.S. §399.3(a)(3).

[4] 68 P.S. §§399.7(a), 399.9.

rent or other charges owed to the landlord, or to obtain reimbursement from the landlord.

The power and the duty of enforcing the Act are vested in the Attorney General. The Attorney General may seek injunctive relief to restrain any person from using any method, act or practice declared by the Act to be unlawful.[5] In that regard, if it is found by the court that any such violation was willful the offender may be subject to a civil penalty of up to $1000.00 for each violation. If a person violates the term of any injunction, he shall forfeit and pay a civil penalty of up to $5,000.00 for each such violation. The civil penalties assessable under the Act are payable to the Commonwealth.[6]

We turn now to the plaintiffs' complaint. Besides contesting the reasonableness of the notice provisions and making general allegations of adverse public impact, the complaint raises five identifiable constitutional challenges to the Act.

*First,* it is asserted that the Act is so indefinite, inconsistent and confusing that it frustrates interpretation and execution of its terms, and thereby unfairly exposes the plaintiffs to substantial civil penalties for noncompliance. In short, this is a challenge that the Act is "void for vagueness." *Second,* the complaint charges that the Act infringes on the right of the plaintiffs and all Philadelphians to local self-government under the city's home rule charter, as guaranteed by the state constitution. *Third,* it is alleged that the Act deprives Management Corporation, PGW and their ratepaying customers of due process of law as guaranteed by both the federal and state constitutions. Underlying this allegation is the further contention that the plaintiffs are compelled, under threat of civil

---

[5] Section 14 of the Act, 68 P.S. §399.14.

[6] The penal provisions are set forth in Sections 16-18 of the Act, 68 P.S. §§399.16-399.18.

penalty, to supply gas at their own expense to persons not under a contract to pay for the service. *Fourth,* the complaint asserts that the Act alters and impairs the terms, conditions, and rights of the plaintiffs under existing contracts, with specific regard to the delivery of gas, the termination of service, and the obligation to pay for it. And, *Fifth,* the Act is challenged as being in violation of the uniformity provisions of the state constitution and the equal protection clause of the federal constitution. This challenge is directed to the fact that the burdens imposed by the Act apply only where the utility is one owned or operated by a "municipal corporation." Thus, it is claimed that the Act subjects plaintiff PGW to penalties which do not confront non-municipal utilities.

Given the provisions of the Act and the plaintiffs' challenges to its validity, we first consider whether the named plaintiffs have standing: to bring this suit in their own right or on behalf of the other interests designated. To resolve this question we must analyze the nature of the named plaintiffs and their relation to the matter in controversy.

The Philadelphia Gas Works, or PGW as it is referred to in this opinion, is not an identifiable legal entity or agency, but is merely the collective name for all the real and personal property by which the City of Philadelphia furnishes gas to customers. Legal title to all that property, including real estate, facilities and equipment, is in the name of the City of Philadelphia. This, the nature of PGW, was specifically noted by the Federal District Court for the Eastern District of Pennsylvania in *Dawes v. Philadelphia Gas Commission,* 421 F. Supp. 806, 811 (E.D. Pa. 1976). We know of nothing which has altered the nature of PGW for purposes of the instant suit; indeed, there is no allegation by the plaintiffs which even suggests any change.

It has long been an axiom of our legal system that, in order to maintain a suit, a would-be plaintiff must have an actual or legal existence. The plaintiff may be a natural or artificial person, but must be an entity which the law recognizes. *E.g., Thompson v. Peck,* 320 Pa. 27, 181 A. 597 (1935); *McConnell v. Apollo Savings Bank,* 146 Pa. 79, 23 A. 347 (1892). Since PGW is not a legal entity of any type, the above jural principle precludes PGW from being a party plaintiff, either for itself or on behalf of any other person. Accordingly, that dimension of this case must be, and is, dismissed.

The standing of Management Corporation presents a more complex question. We start with the self-evident root principle that any objection to the validity of a statute can only be raised by a person having the right to do so. *E.g., Kauffman v. Osser,* 441 Pa. 150, 156, 271 A.2d 236, 239 (1970). A person who is not adversely or directly affected by a statute cannot attack the validity of its provisions. *White v. Philadelphia,* 408 Pa. 397, 184 A.2d 266 (1962). *See Wm. Penn Parking Garage, Inc. v. City of Pittsburgh,* 464 Pa. 168, 192, 346 A.2d 269, 280 (1975). It is also fundamental that a court will not heed objections to the *constitutionality* of a statute unless the complainant is harmed by the particular feature alleged to be unconstitutional; that is, the complainant must be harmed by the particular defect that is claimed to make the statute unconsitutional. *Booz v. Reed,* 398 Pa. 172, 157 A.2d 170 (1960); *Dwyer v. Dilworth,* 392 Pa. 123, 139 A.2d 653 (1958); *Knowles's Estate,* 295 Pa. 571, 145 A. 797 (1929).

The type of harm that can give one standing to challenge the constitutionality of a statute must be a harm in the nature of some special damage or injury to him in a right of person or property. *Kauffman, supra; Dwyer, supra.* Or, as more broadly formu-

lated, the harm must be to some interest of the complainant's which the law recognizes and protects. *Wm. Penn Parking Garage, Inc., supra.* In that regard, our state Supreme Court has indicated that there is no standing to attack the constitutionality of a statute if the alleged harm or adverse impact is indirect or remote, or is a mere side effect of the direct, governmental regulation of or imposition of burdens upon other persons. *Beauty Hall, Inc. v. State Board of Cosmetology,* 418 Pa. 225, 231, 210 A.2d 495, 498 (1965). Put differently, the complainant's interest must be direct. *Wm. Penn Parking Garage, Inc., supra.*

The Management Corporation is a Pennsylvania corporation with a contract to manage the collective assets constituting the gas system known as PGW. The contract is with the City of Philadelphia, owner of the assets; and the contract exists by virtue of City Ordinance No. 455 of December, 1972.[7]

Under the contract, as set forth in the ordinance, the City authorizes Management Corporation to manage and operate the assets of the gas system *for the sole and exclusive benefit of the City.*[8] The contract declares that the primary obligation of Management Corporation is to "apply the highest standards of management practice and diligence" to the operation of the gas system. To that end, the contract imposes on Management Corporation the duty to provide five persons for the operation of the system: (1) a chief executive officer; (2) a chief operating officer; (3) a chief financial officer; (4) an executive in charge of sales; and (5) a chief administrative officer.[9] The

---

[7] Section 6107(a) of the Judicial Code, 42 Pa. C. S. §6107(a), requires that the ordinances of municipal corporations be judicially noticed.

[8] Ordinance No. 455, §I(1).

[9] *Id.* §I(6).

five people designated to staff those positions are subject to the approval of the City Gas Commission, which is an arm of the City government. And, there is no indication, under the contract, that the Management Corporation is to provide any other employees beyond those five. In return for its services, Management Corporation is to receive a management fee.

Although the contract purports to vest managerial functions in the Management Corporation, the contract expressly provides that the efforts of that organization shall be overseen by the City's Gas Commission.[10] Furthermore, all budgetary matters and expenditures for PGW are under the control of the Commission, as is the fixing of rates charged to customers. So too, the contract preserves the power of the Commission to hire such personnel as *it* deems necessary, at the expense of PGW, and preserves in the Commission all other powers not specifically granted to the Management Corporation.

According to Ordinance No. 455, the contract between the Management Corporation and the City is for a duration of two years, subject to cancellation by the City *at any time, or at the expiration of two years,* upon 90 days advance notice.[11] In the absence of such notice of cancellation, the contract shall be continued for an additional two years with the same terms and conditions.

As a final matter, the contract provides that the City shall indemnify the directors of the Management Corporation and hold them harmless from all actions, claims and liabilities which might arise in their capacities as directors of the corporation with regard to the contract.

The plaintiffs' complaint is not fully informative as to the exact legal nature of Management Corpo-

---

[10] *Id.* §VI(9).

[11] *Id.* §XII.

ration. The complaint avers that the organization is a non-profit corporation created under the laws of Pennsylvania; the contract also so describes the entity and adds that the corporation was created "for the specific purposes of operating the Philadelphia Gas Works." However, in *Dawes v. Philadelphia Gas Commission* the federal district court twice described Management Corporation as a *"private* non-profit corporation." There is nothing in City Ordinance No. 455 or the contract itself, or anything else before us, that effectively negates the conclusion of the federal court that Management Corporation is a *private* corporation; and we deem this plaintiff to be such.[12] That Management Corporation is a *private* corporation, even if non-profit, has direct bearing on whether it is even within the Act's definition of a "public utility" as to be directly subject to the burdens of the statute.

The Act has its own specialized definition of a *"public utility,"* which is set forth in Section 2. In part here pertinent that definition is as follows:

'Public utility.' A *municipal corporation* now or hereafter *owning or operating* within its corporate boundaries equipment or facilities for:

(1) Producing, generating, transmitting distributing or furnishing natural or artificial gas . . . to or for the public for compensation. (Emphasis added.)[13]

It is clear from the above definition that to be a "public utility" under the Act the owner or operator of a gas system must be a "municipal corporation." The

---

[12] Although the plaintiffs aver that Management Corporation is a "municipal corporation" as defined by the Act, that is a bald conclusion of law. Conclusions of law need not be deemed true even in the face of a demurrer. *E.g., Gekas v. Shapp,* 469 Pa. 1, 364 A.2d 691 (1976).

[13] 68 P.S. §399.2.

term *"municipal corporation"* is defined by the Act to mean:

> All cities, boroughs, towns, townships, or counties of this Commonwealth, and also any *public corporation,* authority, or body whatsoever created or organized under any law of this Commonwealth. (Emphasis added.)[14]

Since Management Corporation is not one of the above enumerated political subdivisions, it can be a "municipal corporation" only if it is a *"public"* corporation, authority or body. However, as we have observed, Management Corporation is a *private* nonprofit corporation. Being a *private* corporation, it does not fall within any definition of a "municipal corporation," and cannot, for that reason alone, be deemed a "public utility" under the Act.

Also, it being clear that Management Corporation is not the *owner* of the gas system, we submit further that this plaintiff is not really even the *operator* of the system. Management Corporation's role, under its contract with the City, is to provide certain managerial skills and to perform certain managerial tasks, all under the oversight of the City's Gas Commission. In that light, it is realistic to view Management Corporation as the seller of a service which *aids the City of Philadelphia to operate its gas system.* Being neither the owner of the gas system, nor its "operator" in a true sense, Management Corporation is outside the Act's definition of a "public utility" for this additional reason.

Accordingly, because Management Corporation is not a "public utility," the Act does not directly impose any obligations, duties or burdens on this plaintiff itself; for this plaintiff is not in any class that is regulated by the Act.

---

[14] Section 2 of the Act, 68 P.S. §399.2.

Yet, the question of Management Corporation's standing is not completely resolved by this plaintiff's not being an expressly targeted subject of the Act. We must inquire further as to whether the Act operates to unconstitutionally injure this plaintiff in some protected right or interest. *Pierce v. Society of Sisters,* 268 U.S. 510 (1925); *Truax v. Raich,* 239 U.S. 33 (1915). *See Wm. Penn Parking Garage, Inc., supra.* It is our conclusion that four of the five constitutional challenges laid in the complaint before us are not ones that can be raised by plaintiff Management Corporation in its own right. The defects alleged as to those four do not, in our view, injure any direct and substantial interest of this plaintiff.

As noted, Management Corporation has no proprietary interest in the Philadelphia gas system. This plaintiff owns none of the transmission facilities and equipment, none of the gas supplied, or any other asset of the system. This plaintiff bears no expense for the maintenance of the system, the distribution of gas, or the service of customers.[15] Nor does this plaintiff own any of the revenues earned by the system. Therefore, if the Act unconstitutionally invades a property right, as is alleged, by compelling the continuation of gas service to a certain class of users, that affects no proprietary or other substantial interest of plaintiff Management Corporation. Because this alleged particular constitutional defect is not one which harms this plaintiff, there is no standing in this plaintiff to raise it. *Dwyer v. Dilworth, supra.* The entity harmed by any such statutory effect is the City of Philadelphia, which owns the gas system and bears the expense of its operation.

---

[15] Pursuant to Section VII(1)(a)(iv) of Ordinance No. 455, Management Corporation is to be reimbursed against vouchers, on a monthly basis, for any monies expended for the operation of the gas system.

Nor has Management Corporation standing to object that the Act unconstitutionally alters the terms of existing contracts between the gas supplier and its ratepaying customers. The standard gas service contract referred to is in the name of PGW and the customer; in no way does the service contract mention or allude to Management Corporation.[16] And, there is nothing alleged in this case which would constitute Management Corporation a party or privity under any such service contract. The rights and duties under the standard gas service contract are, realistically, in the City of Philadelphia and the particular ratepaying customer; it is their interests that are affected by any statutory impairment of rights under the contract.

As for the "uniformity" and "equal protection" allegation, that the Act unconstitutionally discriminates against municipally owned public utilities, plaintiff Management Corporation has no standing to litigate this point either. Not being a "public utility" as defined by the Act, this plaintiff is not within the class allegedly discriminated against. Indeed, the complaint's express averment on this point speaks only of "PGW and one other municipal gas company" as being the victims of the alleged discrimination; Management Corporation is not even mentioned in this regard.[17] It is a general corollary of the principles governing standing that parties not within the class prejudiced cannot attack a statute as being discriminatory. *Barrows v. Jackson,* 346 U.S. 249 (1953); *Standard Stock Food Co. v. Wright,* 225 U.S. 540 (1912); *Reeves v. Philadelphia Suburban Water Co.,* 288 Pa. 418, 136 A. 526 (1927).

Even if, as is also alleged, the Act is so vague that enforcement of its penal provisions would offend con-

---

[16] "Exhibit B" of plaintiffs' complaint.

[17] Paragraph 15(e) of the complaint.

stitutional due process, that issue, too, is one which the Management Corporation has no standing to litigate in this case. As to this corporation itself, the Act makes no demands, imposes no duties or obligations, and affects no direct substantial interest. Management Corporation, as we have concluded, is neither within the Act nor directly harmed by it in a jural sense. As we have also observed, a litigant may challenge the constitutional validity of a statute only insofar as it affects him. *E.g., Fleming v. Rhodes,* 331 U.S. 100 (1947); *White v. Philadelphia, supra.* Those affected by the Act are municipal corporations that own or operate utilities and their ratepaying landlord customers.

Further, the "void for vagueness" challenge rests on an assertion that the Act is so freighted with uncertain terms that the plaintiffs are exposed to significant monetary penalties out of possible misinterpretation of the statute. However, a reading of the significant penalties referred to, those of $1,000.00 or $5,000.00, are imposed only for the willful use of practices "declared in this [A]ct to be unlawful," for the violation of an injunction restraining the use of such unlawful practices, or for the breach of a stipulation against conduct deemed violative of the Act. The only conduct expressly "declared in this [A]ct to be unlawful" is reprisal by a landlord against a tenant for exercising rights conferred by the Act.[18] And, it would seem that the only source of other violations would be an entity, agency or person having duties under the Act itself: a municipal public utility or a landlord. Management Corporation falls into neither of those categories.

---

[18] That is, aside from the provisions of Section 18 of the Act, 68 P.S. §399.18, which punish a landlord's failure to provide the names and addresses of tenants, and which punish the tampering ,or removal of discontinuance notices.

Based on the principles and considerations already set forth in this opinion, it must be concluded that plaintiff Management Corporation does not itself have the requisite direct interest to raise any of the discussed constitutional challenges *on its own behalf.* Management Corporation is at best a contractual agent for the City of Philadelphia in the City's operation of the municipal gas system; indeed, given the degree of control and supervisory power retained by the City Gas Commission over this plaintiff's participation, it would not be inaccurate to view Management Corporation as a mere servant of the City, insofar as the gas system is concerned. And, certainly, Management Corporation's stake in the controversy is not heightened by the City's express reservation of legal power to cancel the contractual relationship at any time or to refuse to renew it upon the expiration of a two-year period. The Pennsylvania Supreme Court has held that an employee does not have standing to constitutionally challenge a statute or other governmental action where the particular alleged defect has direct impact on the property or business of the employer, but does not harm any direct interest of the employee. *Commonwealth v. Smith,* 409 Pa. 521, 187 A.2d 267 (1963); *Pennsylvania Commercial Drivers Conference v. Pennsylvania Milk Control Commission,* 360 Pa. 477, 62 A.2d 9 (1948). Strongly analogous to the interest of such an employee, if not essentially equivalent, is the relation of Management Corporation to the controversy at bar.

Generally, a party may not contest the constitutionality of a statute because of its effect on the putative rights of other persons or entities. *Warth v. Seldin,* 422 U.S. 490 (1975); *Pequea Valley School District v. Department of Education,* 36 Pa. Commonwealth Ct. 403, 404, 387 A.2d 1022 (1978). Put differently, one ordinarily has no standing to vindicate

the constitutional rights of third persons. *Barrows v. Jackson, supra.* This general principle was reaffirmed by the United States Supreme Court in *Singleton v. Wulff,* 428 U.S. 106 (1976). However, in *Singleton* the Court isolated two elements that could conjoin to create an exception and raise the bar of the general rule: (1) the relationship of the litigant to the third party is such that enjoyment of the right by the third party is inextricably bound up with the activity the litigant seeks to pursue; *and* (2) there is some obstacle to the third party's assertion of his own right. We expressly adopted this formulation in *Harrisburg School District v. Harrisburg Education Association,* 32 Pa. Commonwealth Ct. 348, 379 A.2d 893 (1977).

Even with the above exception to the rule against asserting third party rights, it is clear that Management Corporation has no standing to vindicate the putative constitutional rights of rate-paying landlords; for we can ascertain no reason, and none is alleged, which would prevent the landlords from asserting their own rights.[19] Nor may Management Corporation sue on behalf of PGW. Although there is an obstacle to a suit by PGW itself, as already discussed, that particular obstacle cannot be one that comes within the exception formulated in *Singleton v. Wulff.* PGW remains a "no-thing" without natural or legal existence. The constitutionality of a statute is not to be drawn into question except in connection with its application to some person, natural or artificial. *White v. Johnson,* 282 U.S. 367 (1931); *American Bond & Mortgage Co. v. United States,* 282 U.S. 374 (1931).

The remaining constitutional challenge raised in the complaint is that the Act deprives the plaintiffs "and all other Philadelphians" of a right of local self-

---

[19] The same may be said of other ratepaying customers the plaintiffs purport to represent.

government guaranteed by Article IX, Section 2, of the Pennsylvania Constitution.[20] The allegation underlying this challenge is stated in highly ambiguous terms. The allegation, as stated, is that the "residents of the City of Philadelphia" by adopting a home rule charter gained the right to set, through instrumentality of the City Gas Commission, the rules and regulations for the operation of the City's gas system.

Even if there were a named plaintiff with standing, either in its own right or on behalf of others, to raise the "home rule" challenge, the underlying allegation as framed in the complaint states no cause of action. For neither the Pennsylvania Constitution, the First Class City Home Rule Act,[21] the Philadelphia Home Rule Charter[22] itself, nor any other legal source, confers upon the "residents" the right to set the rules and regulations for the gas system. Apart from the impact of any state statute, that right or power is reposed exclusively in specific agencies of the City of Philadelphia. Article IX, Section 2, of our state constitution granted to the voters of Philadelphia the right to adopt a home rule charter; this grant did not include a direct, cognizable right in the administration of City-owned assets.

If, as the plaintiffs' brief indicates, the "home rule" challenge is really an assertion that the Act is pre-empted by the City Gas Commission's own regulations concerning discontinuances of gas service, we still must conclude that no cause of action has been stated. We reach this conclusion in view of the legal capacity in which the City owns and operates the gas system, on the one hand, and the nature of the powers

---

[20] The "Home Rule Amendment".

[21] Act of April 21, 1949, P.L. 665, *as amended*, 53 P.S. §13101 *et seq.*

[22] 351 Pa. Code §§1.1-100 *et seq.*

conferred by the First Class City Home Rule Act, on the other.

Pennsylvania courts adopted the principle that when a municipality owns or operates a gas system, or supplies gas to its inhabitants for compensation, the municipality is acting not in a governmental capacity but in a private, proprietary, business capacity. *Graham v. City of Philadelphia,* 334 Pa. 513, 6 A.2d 78 (1939); *Philadelphia Gas Works Co. v. Philadelphia,* 331 Pa. 321, 1 A.2d 156 (1938); *Baily v. Philadelphia,* 184 Pa. 594, 39 A. 494 (1898); *Western Saving Fund Society v. The City of Philadelphia,* 31 Pa. 175 (1858); *Bower v. United Gas Improvement Co.,* 37 Pa. Superior Ct. 113 (1908). *See White Oak Borough Authority Appeal,* 372 Pa. 424, 93 A.2d 437 (1953); *Shirk v. Lancaster City,* 313 Pa. 158, 169 A. 557 (1933).

In the *Graham, Philadelphia Gas Works Co.,* and *Baily* cases, our state Supreme Court directly held that the gas system of the City of Philadelphia was owned by the City not as a municipality but as a private, proprietary, business corporation. Although these "proprietary" cases preceded the Home Rule Amendment of the Pennsylvania Constitution, nothing in that Amendment or its state and local implementation altered the capacity in which the City of Philadelphia owns and operates its gas system, and supplies gas to its customers.

The traditional conception of state-municipal legal relations was that a municipality was merely a subordinate creature or instrumentality of the sovereign state. The powers of the state legislature over a municipality were considered to be, except for constitutional limitations, plenary or absolute. In short the state was supreme. Such powers or functions as a municipality had were derived from and deemed dependent upon the will of the state legislature. *Schultz*

*v. Philadelphia*, 385 Pa. 79, 122 A.2d 279 (1956); *Shirk v. Lancaster City, supra; Commonwealth v. Moir*, 199 Pa. 534, 49 A. 351 (1901); *Philadelphia v. Fox*, 64 Pa. 169 (1870). It was in the context of this legal background that the Home Rule Amendment was adopted and subsequently implemented by the First Class City Home Rule Act, which is the operative source of Philadelphia's home rule powers.

The Home Rule Amendment of the Pennsylvania Constitution[23] provides in part that:

> Municipalities shall have the right and power to frame and adopt home rule charters . . . A municipality which has a home rule charter may exercise any power or perform any function *not denied* by this Constitution, by its home rule charter *or by the General Assembly at any time.* (Emphasis added.)

It is thus clear that the Constitution reserved to the state legislature the power to impose restrictions, limitations and regulations on the grant of home rule to the City of Philadelphia. *Cali v. Philadelphia*, 406 Pa. 290, 177 A.2d 824 (1962). When the Amendment was implemented by the First Class City Home Rule Act, the parent of the Philadelphia Home Rule Charter, the legislature did not give the City *carte blanche* powers of home rule but instead imposed restrictions and limitations. Those legislative limitations are cataloged in Section 18 of the implementing statute; and included is the following:

> [*N*]*o city shall engage in any proprietary or private business except as authorized by the General Assembly.* (Emphasis added.)[24]

The above specific limitation virtually speaks for itself: the right of even a home rule city to engage in

---

[23] That is, Pa. Const. art IX, §2.
[24] 53 P.S. §13133.

any proprietary or private business, such as the operation of a gas system, depends on the permission of the state legislature. By the express terms of Section 18 of the First Class City Home Rule Act itself, the legislature has reserved the power to determine in what proprietary business a city may engage, or whether it may engage in any such business at all. Even as to a city already operating a proprietary business under an antecedent grant of permission from the legislature,[25] the proprietary limitation of Section 18 represents a reservation by the legislature of one of its traditional powers over a municipality. Given the reservation of this particular but comprehensive power, it follows that the legislature also reserved the lesser included power to regulate the *manner* in which a city conducts an authorized proprietary business such as a gas system, and to regulate the procedures for the termination of service to consumers. Regarding a city's legislatively-derived right to conduct a private business, it is appropriate to reiterate the observation of our state Supreme Court in *Philadelphia v. Fox*: "the power which can create and destroy can modify and change." 64 Pa. at 181.

Although the state's exercise of powers over the proprietary businesses of municipalities may be subject to *other* constitutional limitations, no such limitation is provided by special force of the Home Rule Amendment, its implementing legislation, or any offspring home rule charter. As already stressed, the legislative implementation of the Amendment granted to the City of Philadelphia restricted powers of home rule. *Cali v. Philadelphia, supra.* What was granted to Philadelphia was a *restricted* right or power of

---

[25] For example, Section 34 of the Act of April 29, 1874, P.L. 73, 15 P.S. §3202, empowered municipal corporations to purchase the property of existing gas companies.

local *self-government.* The City was not granted an *unrestricted power of proprietary business enterprise.*[26]

To summarize the entire instant case, it is an original action by which two named plaintiffs seek to raise five constitutional challenges to a statute enacted by the state legislature, and to enjoin state officials from enforcing the statute. These plaintiffs purport to sue on behalf of themselves and on behalf of other designated interests, ratepaying customers of the Philadelphia gas system. One of the named plaintiffs, PGW, has no legal existence whatsoever, and thus has no capacity to be a party to the suit even in its own behalf, much less on behalf of the other interests. The other plaintiff, Management Corporation, has no standing in its own right to press four of the constitutional challenges, because as to those four challenges it is not directly or substantially affected in a legal sense. Nor may Management Corporation vindicate the putative constitutional rights of the third party interests it purports to represent. As for the remaining constitutional challenge, that the contested statute infringes upon a right of local home rule guaranteed by the Pennsylvania Constitution, even if Management Corporation as a corporate resident of Philadelphia had standing to raise the issue, no cause of action is stated by the plaintiffs' complaint on that particular claim. The statute which granted home rule rights did not deprive the state legislature of the power to regulate the proprietary, private businesses of home rule cities.[27] Such *other* constitutional considerations as

---

[26] *See Vitacolonna v. City of Philadelphia,* 2 Pa. D. & C.2d 761, 786-87 (1954), *aff'd,* 382 Pa. 399, 115 A.2d 178 (1955).

[27] There are cases which held that a municipal corporation furnishing water or gas has the power to make rules and regulations to insure the payment of bills, including the power to stop service. *Girard Life Insurance Co. v. Philadelphia,* 88 Pa. 393 (1879);

might affect the extent of the state's power in this last regard are not presented in this suit by any named plaintiff with standing to raise them.

Given the direct thrust of the statute here in question, the challenges made, and the nature of the interests involved, it could appear that the statute is being "stalked" for the City of Philadelphia itself, *even though the suit on its face does not attempt to include the City's interest.* One could readily form the impression that plaintiff Management Corporation is actually seeking to champion the proprietary interests of its principal, the City. As for those issues we have resolved on the basis of standing, one might wonder initially why the City itself, as proprietor of the gas system, has not brought an action in its own name. After all, our state Supreme Court in *Shirk v. Lancaster City* declared that the private property of a municipal corporation, or property which such a corporation holds in a proprietary capacity, is fully entitled to the property protections of the federal constitution even as against the state.[28] The problem with this proposition in *Shirk* is that it is contrary to and thus nullified by a principle established by the Supreme Court of the United States: that a municipal corporation, being a creature of the state, cannot invoke federal constitutional protections against legis-

*Kohler v. Reitz*, 46 Pa. Superior Ct. 350 (1911). However, these cases did not purport to make the municipality's power in this regard superior to the state legislature's power of regulation, and indeed, did not address the issue of state-municipal regulations.

[28] *Shirk* declared that a municipal corporation, as to its private property in a municipal water works, was protected by the fourteenth amendment of the United States Constitution against the deprivation of property without due process of law. That decision also observed, however, that the federal constitutional protections did not strip the legislature of power to regulate such property devoted to public use, even though operated by a municipality in a proprietary capacity.

lative acts of its sovereign, the state. *Williams v. Baltimore,* 289 U.S. 36 (1933); *Trenton v. New Jersey,* 262 U.S. 182 (1923); *Newark v. New Jersey,* 262 U.S. 192 (1923); *Hunter v. Pittsburgh,* 207 U.S. 161 (1907). *Accord, Department of Environmental Resources v. Westmoreland-Fayette Municipal Sewage Authority,* 18 Pa. Commonwealth Ct. 555, 336 A.2d 704 (1975); *Department of Environmental Resources v. Borough of Carlisle,* 16 Pa. Commonwealth Ct. 341, 330 A.2d 293 (1974); *Commonwealth v. Shippensburg Borough,* 2 Pa. D. & C.3d 417 (1977). This same bar applies whether the municipal function in issue is governmental or proprietary. *Trenton, supra; Newark, supra. Accord, Westmoreland-Fayette Municipal Sewage Authority, supra.*

The bar against a municipal corporation raising *federal* constitutional challenges to state legislation would be circumvented too easily if a hired agent of the municipal corporation were allowed to be the instrument for such challenges where the interests directly involved are those of the municipal corporation itself. The effect of a limitation on the principal would be destroyed if an agent could do what is prohibited. *Lighton v. Abington Township,* 336 Pa. 345, 353, 9 A.2d 609, 612 (1939).[29] Even if there were no companion bar against a municipality raising *state* constitutional challenges against state legislation, the consequence would be that the due process, uniformity, property, and contract protections under the state constitution, insofar as they apply to the City of Philadelphia's interest in the gas system as against the state, would have to be advocated by the City itself

---

[29] If plaintiff Management Corporation were itself a "municipal corporation" as it has legalistically concluded that it is (which conclusion we have rejected), then this plaintiff would be *directly* subject to the bar against asserting federal constitutional challenges to state legislation.

as the real party in interest, and not by its agent, Management Corporation.

Having concluded that there is no plaintiff in the instant suit with standing to raise four of the five constitutional challenges made, and that as to the other challenge, based on asserted rights of home rule, no cause of action has been stated, we sustain the defendants' preliminary objections in the nature of a demurrer.

### ORDER

AND Now, the 8th day of July, 1981, the Defendants' preliminary objections in the nature of a demurrer are hereby sustained; and the Plaintiffs' action is dismissed.

Judge WILKINSON, JR. did not participate in the decision in this case.

Judge PALLADINO dissents.